STATE OF NORTH CAROLINA v. ANTORIO MAURICE SMARR

No. COA00-722

(Filed 4 September 2001)

**1. Criminal Law— questions by court—clarifying sequence of events**

The trial court did not err in a prosecution for second-degree murder, attempted armed robbery, and other crimes by questioning witnesses where defendant contended that the questions aided the State but none of the court's questions suggested an opinion on the facts or commented on the weight of the evidence or the credibility of the witness. All of the information gathered by the court had previously been elicited on direct examination, the order of events had been confused on cross-examination, and the court's questions attempted to ascertain the correct sequence of events.

**2. Criminal Law— questions by court—credibility of witness**

Although defendant contended that questions asked by the trial court in a prosecution for second-degree murder, attempted armed robbery, and other crimes destroyed the credibility of a defense witness, the questions attempted to clarify the sequence of events, did not comment on the weight of the evidence or the credibility of the witness, and had little bearing on defendant's guilt or innocence.

**3. Criminal Law— questions by court—aid to State**

The trial court did not err in a prosecution for second-degree murder, attempted armed robbery, and other crimes by asking a witness questions which defendant contends aided the State. The trial court at no time commented on the strength of the witness's

testimony, his credibility, or whether the State had proved the crimes charged, and the court also asked questions which appeared to help defendant's case. The court was only trying to clarify matters of importance to the jury and the questions were within his power under N.C.G.S. § 8C-1, Rule 614(b).

**4. Sentencing— aggravating factor—involvement of a person younger than sixteen**

The trial court did not err when sentencing defendant for second-degree murder, attempted armed robbery, and other crimes by finding as an aggravating factor that defendant had involved a person under the age of sixteen (McNeil) in the crime where defendant contended that there was insufficient evidence that defendant encouraged or used McNeil in the commission of the crimes and that the aggravating factor was not intended to apply where both participants were children. The court was within its discretion in concluding that McNeil's version of events was more credible and could conclude from the evidence that defendant drew McNeil into the crimes even though defendant did not occupy a position of leadership in the group. N.C.G.S. § 15A-1340.16(d)(13) only requires that the person defendant involves in the crime be under sixteen years old without any reference to a deviation between defendant's age and the age of the person he involves.

**5. Criminal Law— duress—opportunity to escape**

The trial court did not err in a prosecution for second-degree murder, attempted armed robbery, and other crimes by not giving an instruction on duress. Duress is not applicable to murder; furthermore, even under defendant's version of the facts, defendant had the opportunity to avoid committing the crimes without undue exposure to risk of death or serious bodily harm. Defendant's fear that he would be hurt later if the other participants thought that he told the police about their plan is not the kind of immediate threat of harm that would negate his opportunity to escape.

**6. Appeal and Error— suppression of statement—new theory asserted on appeal—not considered**

The argument of a defendant in a second-degree murder and armed robbery prosecution that his statement at the police station was inadmissible was not addressed where defendant asserted on appeal a theory for suppression which was not

asserted at trial and where there was no evidence in the record from which the Court of Appeals could conclude that the statement was taken in violation of defendant's rights.

Appeal by defendant from judgments entered 4 February 2000 by Judge F. Don Bridges in Gaston County Superior Court. Heard in the Court of Appeals 16 May 2001.

*Attorney General Michael F. Easley, by Assistant Attorney General Elizabeth N. Strickland, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Charlesena Elliott Walker, for defendant-appellant.*

CAMPBELL, Judge.

Defendant was convicted by a jury of second degree murder, three counts of attempted robbery with a dangerous weapon, aiding and abetting an assault with a deadly weapon inflicting serious injury, and conspiracy to commit a felony. Defendant was sentenced to a total of 390 to 514 months in prison.

The evidence presented by the State tends to show that Nicholas and Crystal Hammond, along with their cousin Joshua Long ("Long"), were walking along Garrison Boulevard around 4:00 a.m. on 14 July 1998. They saw a Dodge Caravan drive by them two times as they were walking along the road. The van then pulled to a stop in a nearby park. Mr. Hammond observed three black males walking toward him from the direction of the van. Mr. Hammond heard one of them say "what's up" and then heard a gunshot. He turned to see one of the men shoot Long with a handgun. Another man stepped out from a bush, pointed at Mrs. Hammond and said "there the bitch goes." The third individual fired a shot in her direction. Mr. Hammond was also shot by the same assailant who shot Long. Although Mr. and Mrs. Hammond performed CPR on Long, he died at the hospital from loss of blood. Mr. Hammond underwent emergency surgery to remove his spleen, and later had a second surgery to remove a bullet lodged in his back.

Mrs. Hammond described a similar series of events in her testimony, adding that before Mr. Hammond was shot, she heard one of the assailants say "give it up."

STATE v. SMARR

[146 N.C. App. 44 (2001)]

Detective Jimmy Arndt testified that he was one of the primary investigators of the case. He arrived at the crime scene around 5:10 a.m., and later interviewed Mr. and Mrs. Hammond at the hospital. At about 6:05 a.m. on 15 July 1998, he went to the home of defendant with another detective and two uniformed officers. Defendant's mother indicated that defendant was in bed asleep. The officers entered defendant's bedroom and yelled at him to get up and keep his hands where they could see them. They told defendant they needed to talk to him. A loaded revolver was recovered from under defendant's bed. Defendant was transported to the police station where he was read his juvenile Miranda rights (defendant was sixteen years old at the time) and signed a form indicating that he understood his rights and was willing to make a statement.

Later that day defendant directed Detective Arndt to Montrell McNeil's ("McNeil") home, where the detective recovered a .38 caliber handgun, which defendant identified as the weapon McNeil had used during the incident on 14 July 1998.

On cross examination, Detective Arndt testified that during his interview with Mrs. Hammond, she never mentioned a third assailant, nor anyone shouting something from behind a bush. At trial Mrs. Hammond had testified that a third assailant shouted "there goes the bitch."

Defendant took the stand on his own behalf. According to his testimony, he arrived home around 1:00 or 2:00 a.m. on 14 July 1998, and saw McNeil riding his bike nearby. Defendant agreed to go riding with him, but first went inside to retrieve his bike and his gun, which he had recently purchased for protection. Defendant and McNeil had been riding around for a few hours when Chris Lipscomb ("Lipscomb"), an acquaintance of defendant, pulled up alongside them in a van. The three talked for a while and Lipscomb offered them a ride home, but indicated that he needed some gas money. After getting in the van, defendant reached into his pocket and removed his gun in order to get to his wallet. Lipscomb saw the gun and grabbed it. As they were driving to the gas station, Lipscomb announced that he wanted to rob someone. McNeil said he would help, and showed his own gun, but defendant said no. Defendant testified that he felt scared. When the three reached the gas station, Lipscomb handed defendant's gun to McNeil so he could go inside to pay while defendant pumped the gas.

After they got back in the van, they drove by the Hammonds and Long a few times, then pulled over and parked. While parking Lipscomb handed the gun back to defendant. After the van was stopped, Lipscomb demanded the gun back and defendant complied. Lipscomb told defendant to get out of the van. After he was out of the van, the three began to follow the Hammonds and Long on foot. Defendant stopped to tie his shoes, and when he looked up, Lipscomb and McNeil were no longer in sight. He proceeded further down the road and witnessed Lipscomb shoot Long and Mr. Hammond. He also saw McNeil fire his weapon. McNeil and Lipscomb began running towards defendant, and the three got into the van and drove off. Defendant returned home around noon that day.

In rebuttal, the State presented the testimony of Montrell McNeil. McNeil testified that he and defendant had been riding around early on 14 July 1998 looking for someone to rob. After they ran into Lipscomb, they told him they were looking for someone to rob and he agreed to give them a ride. The three spotted the Hammonds and Long and followed them. Lipscomb and defendant argued over who would use defendant's gun, but defendant eventually agreed to allow Lipscomb to use it. McNeil fired his own weapon once, while Lipscomb fired defendant's weapon three times.

[1] Defendant's first argument on appeal is that the trial court committed reversible error when it questioned witnesses in a manner which he contends helped prove the State's case and indicated a bias against defendant. We disagree.

"The judge may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C. Gen. Stat. § 15A-1222 (1999). In discussing an earlier version of the statute, our Supreme Court noted that " '[t]he judge occupies an exalted station, and jurors entertain a profound respect for his opinion. As a consequence, the judge prejudices a party or his cause in the minds of the trial jurors whenever he violates the statute by expressing an adverse opinion on the facts.' " *State v. Carter*, 268 N.C. 648, 653, 151 S.E.2d 602, 606 (1966) (citation omitted in original) (quoting *State v. Canipe*, 240 N.C. 60, 64, 81 S.E.2d 173, 177 (1954)). Thus, " '[t]he law imposes on the trial judge the duty of absolute impartiality.' " *State v. Fleming*, 350 N.C. 109, 125-26, 512 S.E.2d 720, 732 (1999) (quoting *Nowell v. Neal*, 249 N.C. 516, 520, 107 S.E.2d 107, 110 (1959)).

Nevertheless, the trial court is permitted to "interrogate witnesses, whether called by itself or by a party." N.C. Gen. Stat. § 8C-1, Rule 614(b) (1999). Furthermore, in order to insure justice for the parties, the trial court may ask clarifying questions of a witness to alleviate confusion. *State v. Quick*, 329 N.C. 1, 21-22, 405 S.E.2d 179, 192 (1991). Such questions are only prejudicial error if "by their tenor, frequency, or persistence, the trial judge expresses an opinion." *State v. Rinck*, 303 N.C. 551, 562, 280 S.E.2d 912, 921 (1981).

Defendant complains of three instances in which the trial court questioned witnesses in a manner he considers prejudicial. On cross examination, the prosecutor asked defendant when the topic of robbing someone first came up. Defendant responded that it had come up "[w]hen we was leaving out of Bojangle's." The trial court then intervened:

THE COURT: When you were leaving Bojangle's?

A. When we left out of Bojangle's and we were starting to go down the hill. That's when we planned—Mr. Lipscomb said he wanted to rob somebody.

THE COURT: What did he say then?

A. He had said that y'all want to rob somebody and I told him no. I said are you crazy. I said I ain't robbing nobody.

THE COURT: Now was that before or after you stopped to get gas?

A. That was before we went to go get gas.

THE COURT: So before he stopped to get gas he was talking about robbing somebody?

A. Yes, sir.

THE COURT: When was it you took your gun out of your pocket when you reached for your wallet?

A. When we was in the Bojangle's parking lot.

THE COURT: You pulled your wallet out in Bojangle's parking lot?

A. Yes, sir.

THE COURT: Why did you do that?

A. To get the money. I was getting the money out that I was going to give [Lipscomb] for the gas.

THE COURT: That was all while you were in the Bojangle's parking lot?

A. Yes, sir.

THE COURT: [To the prosecutor] Go ahead.

Defendant argues that these questions by the trial court aided the State by emphasizing that defendant had not taken advantage of opportunities to leave McNeil and Lipscomb before the robbery and by suggesting that defendant's claim that he did not willingly remain with McNeil and Lipscomb was "pure nonsense." We disagree. The trial court's questions indicate an attempt to ascertain the correct sequence of events. All of the information gathered by the trial court had previously been elicited on direct examination, but on cross examination, the order of the events was confused. None of the questions by the trial court suggest an opinion on the facts, nor do they comment on the weight of the evidence or the credibility of the witness. We hold that the trial court acted properly by clarifying confusing testimony, with no resulting prejudice to defendant.

[2] Defendant also objects to questions the trial court asked of defendant's sister, Shawntay, which he contends impeached her credibility. The trial court questioned Shawntay as follows:

THE COURT: When was it that you saw Chris Lipscomb drive by and stop?

A. I'm not for sure. I mean I didn't know that all this stuff had went on, but I think it was like that next day.

THE COURT: What time the next day?

A. Probably like that evening, about 3:30, 4:00. Probably about 3:30, somewhere around in there.

THE COURT: Where was your brother then?

A. My brother was gone.

THE COURT: Where was he gone?

A. I believe he went with his friend Tracy.

It appears from the transcript that defendant presented Shawntay's testimony to show that Lipscomb was trying to threaten defendant by suspiciously driving by defendant's home. If the jury

believed this version of events, Shawntay's testimony would lend credibility to defendant's belief that he would be harmed if he told the police about Lipscomb and McNeil's participation in the robbery and murder.

Defendant contends that these questions by the trial court "destroyed" Shawntay's credibility because they forced her to assign a specific time to the events, i.e., the specific time that Lipscomb drove by defendant's house. Defendant contends that the testimony elicited by the trial court makes it appear as though Lipscomb drove by defendant's house after he had already been arrested (defendant was arrested at 6:00 a.m. on 15 July 1998), which would mean that defendant could not have been intimidated or threatened by Lipscomb's behavior. Thus, according to defendant, it made it appear to the jury that Shawntay was "obviously lying."

We conclude, however, that these questions were meant to clarify the sequence of events Shawntay was describing. On direct examination, Shawntay had been unclear as to what day Lipscomb had driven by. The questions of the trial court were an attempt to clarify this information. Again, the trial court made no comment as to the weight of the evidence or the credibility of the witness. Furthermore, these questions and their answers had little bearing on defendant's guilt or innocence. We hold that these questions were proper for purposes of clarification and did not prejudice defendant.

[3] Finally, defendant objects to questions the trial court directed toward McNeil during the State's rebuttal evidence, arguing that these questions helped the State prove part of its case. The trial court had the following exchange with McNeil:

THE COURT: Excuse me for a second. You mentioned talking about committing an armed robbery.

A. Yes, sir.

THE COURT: This was something that came up in a conversation?

A. (Indicating yes)

THE COURT: How did that topic come up in conversation?

A. I can't remember.

THE COURT: Who was present when you had that conversation?

A. Torry.

THE COURT: You and Mr. Smarr?

A. Yes, sir.

THE COURT: Where were you?

A. We were standing in front of his house.

THE COURT: As you best recall, what did you say and what did he say?

A. He was like if we commit an armed robbery do you think you can get away and I was like, no, because the bike is messed up.

THE COURT: Now was that conversation before or after he went in the house to get his gun?

A. It was before.

THE COURT: All right. I'm sorry. [To the prosecutor] Go ahead.

Defendant contends that these questions refuted defendant's testimony that he never intended to commit armed robbery and that before the trial court asked these questions the prosecutor had shown no interest in developing McNeil's testimony as to a prior intent to commit armed robbery, but after the trial court's questioning, he began to focus on this issue.

"A judge may ask questions . . . that elicit testimony which proves an element of the State's case so long as he does not comment on the strength of the evidence or the credibility of the witness." *State v. Lowe*, 60 N.C. App. 549, 552, 299 S.E.2d 466, 468 (1983) (citing *State v. Stanfield*, 19 N.C. App. 622, 626, 199 S.E.2d 741, 744 (1973)). A judge may not, however, "by his questions to a witness intimate an opinion as to whether any fact essential to the State's case has been proved." *Id.* (citing *State v. Hudson*, 295 N.C. 427, 435, 245 S.E.2d 686, 691 (1978)). In the line of questioning above, the trial court may have asked questions, the answers to which provided useful testimony for the State. However, the trial court at no time commented on the strength of McNeil's testimony, his credibility, nor whether the State had proved the crimes charged against defendant. The record also indicates that the trial court asked McNeil questions that appeared to *help* defendant's case. At one point the trial court asked McNeil if he had heard anyone say "there goes the bitch" (as Mrs. Hammond testified that defendant had said). McNeil replied that he had not.

These questions suggest that the trial court was only trying to clarify matters of importance to the jury. The questions were within his power under Evidence Rule 614(b). Furthermore, none of the trial court's questions explicitly or implicitly stated an opinion as to the facts or the witnesses' credibility. Defendant's assignment of error on this point is overruled.

**[4]** Defendant's second argument is that the trial court improperly applied a statutory aggravating factor in determining his sentence when it found that defendant involved a person under the age of 16 in the crime. *See* N.C. Gen. Stat. § 15A-1340.16(d)(13) (1999). Defendant contends that this factor should not apply for two reasons: (1) the evidence presented was insufficient to support a finding that defendant "encouraged or used" McNeil (who was fifteen at the time of the crime) in the commission of the crimes, and (2) that the legislature did not intend the factor to apply where both participants are children. We disagree.

The State has the burden of proving aggravating factors, and must prove them by a preponderance of the evidence. *State v. Canty*, 321 N.C. 520, 523, 364 S.E.2d 410, 413 (1988). In making sentencing determinations, the trial court must consider all the aggravating or mitigating factors supported by the evidence, but the trial court has "wide latitude" to weigh the credibility of the evidence in determining the existence of aggravating factors. *Id.* at 524, 364 S.E.2d at 413.

Here, the trial court had to consider the differing stories presented by defendant and McNeil. The trial court was within its discretion, however, to conclude that McNeil's version of events was more credible, and that defendant did in fact involve McNeil in the crime. Although the trial court rejected the State's assertion that defendant induced others to participate in the commission of the offense or occupied a position of leadership or dominance of other participants in the offense (a statutory aggravating factor under N.C. Gen. Stat. § 15A-1340.16(d)(1)), it could conclude from the evidence presented that while defendant did not occupy a position of leadership in the group, he did draw McNeil into participating in the crime.

Defendant's second contention on this point is that the legislature did not intend this aggravating factor to apply when both participants in the crime were children. It is undisputed in the evidence that defendant was sixteen at the time of the offense and McNeil was fifteen. We note that the legislature has clearly instructed that persons

aged sixteen or older are to be tried as adults. "Any juvenile . . . who commits a criminal offense on or after the juvenile's sixteenth birthday is subject to prosecution as an adult." N.C. Gen. Stat. § 7B-1604(a) (1999). Furthermore, N.C. Gen. Stat. § 15A-1340.16(d)(13) only requires that the person the defendant involves in the crime be under sixteen years old, without any reference to a deviation between the defendant's age and the age of the person he involves. On the other hand, other statutes do make clear such an age deviation. *See, e.g.,* N.C. Gen. Stat. § 14-27.7A (1999) (classification of statutory rape as a Class B1 felony or a Class C felony depends on the age difference between the defendant and the victim). This Court is unable to infer any legislative intent to impose a requirement of any specific age difference between the defendant and the person under age sixteen he involves in the crime where no such intent is indicated by the statute itself. Therefore, we conclude that the trial court did not err in finding as an aggravating factor that defendant involved a person under the age of sixteen in the commission of the offense.

**[5]** Defendant next argues that the trial court committed reversible error by not instructing the jury on duress.[1] We disagree.

Generally, the trial court must give an instruction on any substantial feature of a case, regardless of whether either party has specifically requested an instruction. *State v. Henderson,* 64 N.C. App. 536, 539, 307 S.E.2d 846, 848 (1983). Any defense raised by the evidence is a substantial feature of the case, and as such an instruction is required. *Id.*

It should first be noted that a defense of duress is not applicable to murder. *State v. Cheek,* 351 N.C. 48, 61, 520 S.E.2d 545, 553 (1999), *cert. denied,* 530 U.S. 1245, 147 L. Ed. 2d 965 (2000). Defendant acknowledges this rule, but contends that duress is a defense to the other charges against him, and that the trial court's failure to give the duress instruction as to these charges was error.

"In order to successfully invoke the duress defense, a defendant would have to show that his 'actions were caused by a reasonable fear that he would suffer immediate death or serious bodily injury if he did not so act.' " *Id.* at 61-62, 520 S.E.2d at 553 (quoting *State v. Strickland,* 307 N.C. 274, 299, 298 S.E.2d 645, 661 (1983), *overruled on other grounds by State v. Johnson,* 317 N.C. 193, 344 S.E.2d 775

---

1. North Carolina case law uses the terms duress and coercion interchangeably.

STATE v. SMARR

[146 N.C. App. 44 (2001)]

(1986)). Furthermore, a defense of duress "cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm." *State v. Kearns*, 27 N.C. App. 354, 357, 219 S.E.2d 228, 231 (1975). A defendant must present evidence on each element of the defense for the trial court to instruct the jury on that defense. *Henderson*, 64 N.C. App. at 540, 307 S.E.2d at 849.

Even under defendant's version of the facts, it is clear that defendant *did* have an opportunity to avoid committing the crimes without undue exposure to risk of death or serious bodily harm. When defendant, Lipscomb, and McNeil reached the gas station, defendant was alone outside pumping the gas. This gave him the opportunity to run away or call for help, but he chose to get back in the van. In addition, when McNeil and Lipscomb left the van to attack the Hammonds and Long, defendant got out with them but stopped to tie his shoes. At this point, McNeil and Lipscomb had gotten so far away they were out of defendant's eyesight, thus giving defendant another opportunity to run away and avoid being part of the armed robbery. Defendant's fear that McNeil and Lipscomb might later hurt him if they thought he told the police about their plan is not the kind of immediate threat of harm that would negate his opportunity to escape. Because defendant did have an opportunity to leave the scene without undue exposure to risk of death or serious bodily injury, we conclude that the trial court was correct in declining to give an instruction on duress.

[6] Defendant's final argument is that the trial court erred by admitting the written statement defendant made at the police station after his arrest. Defendant asserts that this statement was inadmissible as "fruit of the poisonous tree" from defendant's previous statements made at his home before he received his Miranda warnings.

We first note that defendant never made a formal motion to suppress the statement he made to police. Rather, he objected to its introduction during Detective Arndt's testimony. Defendant's trial counsel argued two theories in support of his objection. First, he argued that defendant's waiver was not knowing and voluntary. Second, he argued that the transcript of the statement should be barred by the best evidence rule, and that an actual audio recording of the statement should be the only admissible form of defendant's statement, if any. At no time did defendant's trial counsel argue that a failure to inform defendant of his Miranda rights at his home made his

later statement at the police station inadmissible as "fruit of the poisonous tree."

Defendant's change in tactics is important, because a defendant may not assert on appeal a new theory for suppression which was not asserted at trial. *State v. Benson*, 323 N.C. 318, 321-22, 372 S.E.2d 517, 518-19 (1988). As our Supreme Court has stated, "[d]efendant may not swap horses after trial in order to obtain a thoroughbred upon appeal." *Id.* at 322, 372 S.E.2d at 519 (citing *Weil v. Herring*, 207 N.C. 6, 175 S.E. 836 (1934)). For this reason, we conclude that defendant's final argument is not properly before us and therefore we do not address it. Furthermore, there is no evidence preserved in the record from which this Court could conclude that a statement was taken in violation of defendant's rights.

We conclude that defendant had a fair trial, free from prejudicial error.

No error.

Judges WYNN and BIGGS concur.