*327 II. Analysis
In Defendant's sole argument, he contends the trial court erred by refusing to instruct the jury on the defense of necessity when the evidence presented at trial supported giving the instruction. We agree.
A. Case Law
The affirmative defense of necessity is available to defendants charged with driving while under the influence ("DWI"). State v. Hudgins , 167 N.C. App. 705, 710, 606 S.E.2d 443, 447 (2005). As an affirmative defense, "the burden rests upon the defendant to establish this defense, unless it arises out of the State's own evidence, to the satisfaction of the jury." State v. Caddell , 287 N.C. 266, 290, 215 S.E.2d 348, 363 (1975). It is well established:
A trial court must give a requested instruction if it is a correct statement of the law and supported by the evidence. "Any defense raised by the evidence is deemed a substantial feature of the case and requires an instruction." For a particular defense to *695 result in a required instruction, there must be substantial evidence of each element of the defense when viewing the evidence in a light most favorable to the defendant . "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' "
State v. Brown , 182 N.C. App. 115, 117-18, 646 S.E.2d 775, 777 (2007) (citations omitted) (emphasis added). However, " 'a trial court is not obligated to give a defendant's exact instruction so long as the instruction actually given delivers the substance of the request to the jury.' " State v. Holloman , 369 N.C. 615, 625, 799 S.E.2d 824, 831 (2017) (citations omitted). Further,
a trial judge's jury charge shall "give a clear instruction which applies the law to the evidence in such manner as to assist the jury in understanding the case and in reaching a correct verdict." For that reason, "the judge has the duty to instruct the jury on the law arising from all the evidence presented." In instructing the jury with respect to a defense to a criminal charge, "the facts must be interpreted in the light most favorable to the defendant ."
Id. at 625, 799 S.E.2d at 831 (citations omitted) (emphasis added).
*328 "A defendant must prove three elements to establish the defense of necessity: (1) reasonable action, (2) taken to protect life, limb, or health of a person, and (3) no other acceptable choices available." Hudgins , 167 N.C. App. at 710-11, 606 S.E.2d at 447.
The rationale behind the defense is based upon the public policy that "the law ought to promote the achievement of higher values at the expense of lesser values, and [that] sometimes the greater good for society will be accomplished by violating the literal language of the criminal law." "[I]f the harm which will result from compliance with the law is greater than that which will result from violation of it, [a person] is justified in violating it."
State v. Thomas , 103 N.C. App. 264, 265, 405 S.E.2d 214, 215 (1991) (citations omitted) (alterations in original).
The question before this Court, which we review de novo , is whether, when viewed in the light most favorable to Defendant, substantial evidence was presented at trial that Defendant took "(1) reasonable action, (2) taken to protect life, limb, or health of a person, and (3) no other acceptable choices [were] available" to Defendant. Hudgins , 167 N.C. App. at 710-11, 606 S.E.2d at 447. Therefore, if the evidence presented at trial, viewed in the light most favorable to Defendant and ignoring all contradictory evidence, was sufficient to permit the jury to reasonably infer the existence of these three elements, the trial court was required to give the instruction on necessity. It would then be the sole province of the jury to determine whether, based upon those facts, Defendant had met his burden of proving necessity to the satisfaction of the jury:
[Our appellate] cases enunciate and reiterate the rule-established in our law for over one hundred years,-that when the burden rests upon an accused to establish an affirmative defense ... the quantum of proof is to the satisfaction of the jury-not by the greater weight of the evidence nor beyond a reasonable doubt-but simply to the satisfaction of the jury . Even proof by the greater weight of the evidence-a bare preponderance of the proof-may be sufficient to satisfy the jury, and the jury alone determines by what evidence it is satisfied.
State v. Freeman , 275 N.C. 662, 666, 170 S.E.2d 461, 464 (1969) (citations omitted).
*329 We now address a potential issue that arises from the present appeal. During the charge conference, Defendant requested that the trial court give an instruction on necessity and duress, but specifically requested N.C.P.I. Crim. 310.10, the instruction for "Compulsion, Duress, or Coercion." In North Carolina, there is no pattern jury instruction that expressly addresses the defense of necessity. At the charge conference, both Defendant and the State discussed a recent unpublished opinion of this Court, State v. Badson , 242 N.C. App. 384, 776 S.E.2d 364, 2015 WL 4430202 (2015) (unpublished).[1] In *696 Badson , this Court stated: "Although the defenses of duress and necessity were 'historically distinguished' under common law, '[m]odern cases have tended to blur the distinction[.]' State v. Monroe , 233 N.C. App. 563, 565, 756 S.E.2d 376, 378 (2014). Thus, for purposes of this opinion, the two defenses are discussed interchangeably." Badson , 242 N.C. App. 384, 776 S.E.2d 364, 2015 WL 4430202 at *3.[2] We note that the language quoted from Monroe is language discussing federal law, not the law of North Carolina. Monroe , 233 N.C. App.at 565, 756 S.E.2d at 378 (2014). Further, in Badson this Court quotes Hudgins for the proposition that the "defense of necessity is available in a DWI prosecution[,]" Badson , 2015 WL 4430202 at *4 (citation omitted), and sets forth the elements of necessity as found in Hudgins : "(1) reasonable action, (2) taken to protect life, limb, or health of a person, and (3) no other acceptable choices available." Id . (citation omitted).
The elements of duress have been stated as follows:
"In order to successfully invoke the duress defense, a defendant would have to show that his 'actions were caused by a reasonable fear that he would suffer immediate death or serious bodily injury if he did not so act.' " Furthermore, a defense of duress "cannot be invoked as an excuse by one who had a reasonable opportunity to avoid doing the act without undue exposure to death or serious bodily harm."
State v. Smarr , 146 N.C. App. 44, 54-55, 551 S.E.2d 881, 888 (2001) (citations omitted). The pattern jury instruction for compulsion, duress, or coercion states, partially tracking the language of Smarr and other opinions involving duress:
*330 310.10 COMPULSION, DURESS, OR COERCION.
There is evidence in this case tending to show that the defendant acted only because of [compulsion] [duress] [coercion]. The burden of proving [compulsion] [duress] [coercion] is upon the defendant. It need not be proved beyond a reasonable doubt, but only to your satisfaction. The defendant would not be guilty of this crime if his actions were caused by a reasonable fear that he (or another) would suffer immediate death or serious bodily injury if he did not commit the crime . His assertion of [compulsion] [duress] [coercion] is a denial that he committed any crime. The burden remains on the State to prove the defendant's guilt beyond a reasonable doubt.
N.C.P.I. Crim. 310.10 (emphasis added).
We find no binding precedent supporting the proposition that duress and necessity have ceased to be distinct defenses in North Carolina.[3] In recognizing the availability of the necessity defense in trials for DWI, this Court in Hudgins held that the defense of necessity was available based in part on the fact that other "common law defenses are available in DWI prosecutions." Hudgins , 167 N.C. App. at 709, 606 S.E.2d at 447. Countering the State's argument that the necessity defense should not be allowed, this Court held:
The State's argument cannot be reconciled with decisions of this Court indicating that common law defenses are available in DWI prosecutions. This Court recently held that "[i]n appropriate factual circumstances, the defense of entrapment is available in a DWI trial." This Court has also implicitly acknowledged that the defense of duress would be appropriate in a DWI trial. See State v. Cooke , 94 N.C. App. 386, 387, 380 S.E.2d 382, 382-83 [.]
Moreover, courts in other jurisdictions have specifically held that the defense of necessity is available in a DWI prosecution. We likewise hold that the defense of necessity is available in a DWI prosecution.
Id . at 709-10, 606 S.E.2d at 447 (citations omitted) (emphasis added). If necessity and *697 duress have ceased to be distinct defenses in North *331 Carolina, this Court in Hudgins could have simply cited Cooke as having implicitly established the viability of the merged necessity/duress defense instead of relying on Cooke's implicit acceptance of the duress defense, along with this Court's explicit recognition of the defense of entrapment, in order to hold that the defense of necessity is also available to defendants on trial for DWI. In addition, reference to the acceptance of necessity as a defense to DWI in other jurisdictions would have been superfluous. We hold the defense of necessity is recognized as a defense separate and distinct from the defense of duress (compulsion or coercion).
In the present case, both parties and the trial court, while discussing the elements of the requested instruction at the charge conference, solely discussed the elements of necessity as set forth in Badson -and thus Hudgins . However, the elements in Hudgins do not track the language in N.C.P.I. Crim. 310.10, the pattern jury instruction for duress. The State argued the required elements as follows: "That it first must be a reasonable act taken to ... protect the life, limb, or health of a person. .... And to the third action, that [there] must be no other acceptable choices available." The State then suggested that this Court's opinion in Cooke recognized a fourth element: "That [D]efendant [continued to face] threatening conduct of any kind at the time the officer saw him while driving while intoxicated."
Despite the fact that the elements discussed by the parties at the hearing were those for necessity, the trial court, clearly relying on language from N.C.P.I. Crim. 310.10, denied Defendant's request to instruct the jury on the defense of necessity based upon its determination that no evidence had been presented demonstrating that Defendant was in actual "fear" at the time he drove the golf cart on the highway:
[THE COURT:] While the issue appears on it sure to be quite detailed and involved really, a look at the instruction makes it fairly simple in terms of the resolution here. The instruction 310.10 reads in pertinent part to the extent that it influences the decision here, quote:
....
[ ] [D]efendant would not be guilty of this crime if his actions were caused by a reasonable fear that he or another would suffer immediate death or serious bodily injury if he did not commit the crime. Unquote.
Of course there is reasonable dispute concerning the length of time that was involved here in terms of when *332 that fear still is recognized by the law to be present and existent in terms of the length of time or the length of participation as to where there was a fear that began as opposed to the point where it was still considered to be ongoing until such time as the deputy effected the stop here.
There's also the aspect as to whether or not, as the [S]tate argues as well, whether there was such a serious threat that would connote immediate death or serious bodily injury being a potential outcome but for [ ] [D]efendant's actions.
But all of that presupposes something that's not even in evidence, and that is, in terms of looking at the plain language of the instruction, [ ] [D]efendant will not be guilty of this crime if his actions were caused by reasonable fear.
There is no evidence that [ ] [D]efendant was in fear. There's evidence that the testimony was his wife was in fear, but there's no evidence that [ ] [D]efendant was in fear for me to consider over this instruction being given, so as to instruction about that, this point 310.30 will not be given because there is no evidence that [ ] [D]efendant had a reasonable fear which would have him to commit the alleged crime.
....
[DEFENDANT'S COUNSEL:] To say that the only way that [Defendant] can mount the defense is to actually hear from [him] would be a violation of his right against self-incrimination.
THE COURT: I didn't say that [Defendant] had to testify that he was in fear. I said there is no evidence that he was in fear , whether that would come from him or anybody else that he was in fear. But you can make your statements for the record, *698 but I've made the decision. (Emphasis added).
The trial court clearly considered there to be an additional element requiring that Defendant was motivated by emotional "fear" to drive the golf cart on the highway. Our case law does not include fear as an element of the defense of necessity. "A defendant must prove three elements to establish the defense of necessity: (1) reasonable action, (2) taken to protect life, limb, or health of a person, and (3) no other acceptable *333 choices available." Hudgins , 167 N.C. App. at 710-11, 606 S.E.2d at 447 (citation omitted). Although Defendant's mental state could be potentially relevant in analyzing the required elements, fear itself is simply not an element of the defense.
We are not called upon in the present appeal to determine whether "fear," as implicitly defined by the trial court in the present case-an emotional or mental state-is an element of the defense of duress.[4] However, in the interest of being thorough, we compare the elements of the defenses of necessity and duress as set forth in appellate opinions of this State. The elements of necessity are that the defendant engaged in "(1) reasonable [though illegal] action, (2) taken to protect life, limb, or health of a person, and (3) no other acceptable choices [were] available[.]" Hudgins , 167 N.C. App. at 710-11, 606 S.E.2d at 447 (citations omitted). The elements of duress are (1) that a defendant's illegal " 'actions were caused by [the defendant's] reasonable fear that [the defendant or another] would suffer' " (2) " 'immediate death or serious bodily injury[,]' " (3) " 'if [the defendant had] not so act[ed][,]' " and (4) the defendant had no "reasonable opportunity to avoid doing the [illegal] act without undue exposure to death or serious bodily harm." Smarr , 146 N.C. App. at 54-55, 551 S.E.2d at 888 (citations omitted). Both necessity and duress require that a defendant demonstrate an absence of reasonable alternatives to the course of action actually undertaken.[5]
Though not expressly stated in any precedent that we have found, the manner in which the elements of necessity are worded implies that they are analyzed pursuant to an objective standard of reasonableness, not a subjective standard: "(1) reasonable action, (2) taken to protect life, limb, or health of a person, and (3) no other acceptable choices available." Hudgins , 167 N.C. App. at 710-11, 606 S.E.2d at 447 (citation omitted). In potential contrast, the first element of duress, as established by precedent and as presented in N.C.P.I. Crim. 310.10, suggests a *334 subjective standard-that the defendant acted based upon his "reasonable fear that [he or another] would suffer immediate death or serious bodily injury" absent his actions. Smarr , 146 N.C. App. at 54-55, 551 S.E.2d at 888 (citations omitted).
This focus on a defendant's "fear" makes sense in the context of duress, coercion or compulsion, because this defense is generally used to justify the actions of a defendant based upon intentional threats from a third party for the express purpose of coercing the defendant to act in an illegal manner. For example, in State v. Cheek , 351 N.C. 48, 520 S.E.2d 545 (1999), our Supreme Court, in rejecting the defendant's duress argument, reasoned:
Defendant contends that the Nelson diary was material to defendant's defense because it supported defendant's contention that Nelson was a violent person, which in turn supported defendant's defense that he accompanied Nelson only out of fear. ....
....
*699 [T]he affirmative defense of duress, if proven, would serve as a complete defense to the kidnapping and robbery charges. In order to successfully invoke the duress defense, a defendant would have to show that his "actions were caused by a reasonable fear that he would suffer immediate death or serious bodily injury if he did not so act."
In the case sub judice , the record contains no evidence which indicates that defendant participated in the kidnapping and robbery of Oxendine as a result of coercion . During the extended course of the crimes against Oxendine, defendant had several opportunities to report that he had been forced by duress to commit these crimes and to seek help. The record shows that defendant went to New Hanover Hospital after the murder, where he could have sought help, but he failed to do so.
Id. at 61-62, 520 S.E.2d at 553 (citations omitted); see also State v. Shields , COA17-69, 2017 WL 6460104, at *4 (2017) (unpublished opinion) ("defendant presented evidence that he remained afraid of Travis even after he entered the home with the other men, and that his continued fear precluded any reasonable opportunity to retreat").
Necessity, however, tends to be used to excuse actions that were based upon a defendant's reasonable response to some event or *335 occurrence , not necessarily involving a third-party, that threatens the life or health of any person. For example, in Hudgins , the defendant was convicted of driving while impaired, but argued that the trial court should have instructed the jury on the defense of necessity. Hudgins , 167 N.C. App. at 708, 606 S.E.2d at 446. According to the defendant's evidence, he was intoxicated, but was being driven home by his sober friend "Maney," in Maney's truck, when Maney pulled off the road and stopped to examine a fallen tree. Id . at 707, 606 S.E.2d at 445. While both Maney and the defendant were outside the truck, the defendant "looked back and saw that the truck was rolling. Id . He ran to the truck, jumped in the passenger door, slid over to the driver's side, and unsuccessfully tried to stop the truck[,]" which ended up hitting another vehicle and a house. Id. The defendant's actions in Hudgins were clearly not the result of coercion by a third-party, nor the result of fear of any bodily harm to himself. Id . In fact, the defendant's actions removed the defendant from a place of safety and placed him in a place of physical danger. Id . at 711, 606 S.E.2d at 448 ("The fact that defendant and Maney were themselves safely out of harm's way, as the State argues, is irrelevant if the jury believed that defendant's actions were necessary to protect others.").
In Hudgins , this Court held that the evidence, taken in the light most favorable to the defendant, was sufficient to allow a proper inference that he acted reasonably under the circumstances-for the purpose of protecting others from the runaway truck-and that no other acceptable choices were available. Id . at 711-12, 606 S.E.2d at 448 ("because the record contains substantial evidence of each element of the necessity defense, the trial court should have instructed the jury on that defense").
Presumably, in the present case, Defendant requested N.C.P.I. Crim. 310.10 because no specific North Carolina Pattern Jury Instruction exists for the defense of necessity. Although Defendant could have requested a non-pattern jury instruction correctly stating the elements of necessity, it was not fatal to his argument that he failed to do so. "[A] trial judge [is] not ... relieved of his duty to give a correct ... instruction, there being evidence to support it, merely because [a] defendant's request was not altogether correct." State v. White , 288 N.C. 44, 48, 215 S.E.2d 557, 560 (1975) (citation omitted). With these issues in mind, we look de novo to determine whether there was evidence sufficient to support Defendant's requested necessity instruction.
B. Additional Facts
The evidence viewed in the light most favorable to Defendant was as follows: Defendant and Heather lived in close proximity to Bones.
*336 There were "paths" that connected the house with Bones, and it was possible to travel between the house and Bones without ever travelling on any public roadway. Defendant and Heather had utilized the paths on *700 multiple prior occasions, either by walking or by driving the golf cart. The purpose of utilizing the golf cart and the paths was to avoid driving a car, and further to avoid the use of public roadways, after consuming alcohol. Bones attracted varied clientele, and had become "kind of a rough place" where there could be "fights and it was just very unpredictable." Deputy Legan testified that he had known Bones "to be an establishment that serves the biker crowd."
Defendant and Heather arrived at Bones' parking lot in the golf cart at approximately 9:30 p.m. on 1 March 2014. Heather testified that they planned on returning home "[t]he same way we came. I knew I probably would be driving the golf cart home, but just the same we came through the back path." Heather testified that she would probably drive home because it was likely that Defendant would drink more alcohol than she. According to Heather, as the night progressed the atmosphere at Bones "became intense; it became kind of mean. It just wasn't a place I wanted to be in anymore." Heather testified that while at Bones-a period of less than three hours-she consumed "more than four, less than seven" alcoholic drinks, and that she did not eat anything during that time because she had eaten dinner before leaving the house that evening. Defendant and Heather decided to leave shortly after midnight, 2 March 2014, and Heather went to the restroom while Defendant went outside to wait for her.
When Heather walked out of Bones, she noticed Defendant was in the parking lot arguing with "several guys" that she did not know. There were at least three men with whom Defendant was arguing, and there may have been as many as five. The arguing was intense, involving shouting and cursing, and Defendant eventually punched one of the men ("the man"), who was in his "late 20s, maybe early 30s[,]" causing the man to fall to the ground. Defendant later described the man to Deputy Legan as "the baddest motherf_cker in the bar[.]" Heather further testified that when the man "got up he was extremely red-faced and he pulled a gun from his waistband" and "[r]aised it in the air." Heather testified that Defendant did not have a gun and, that as far as she knew, Bones did not have security guards or bouncers. Heather testified:
It got very, very chaotic at that point. There was a woman [who] was next to me who was-she said "you need to get out of here. He's crazy."[6] [Defendant] had turned around *337 and was screaming at me "go, go, go, go, go." We got going. When [the man] pulled the gun I just wanted to get out of there.
Heather further testified that, after the man raised the gun, she started screaming and just "wanted to get out." When she saw the gun she wanted "[j]ust to get away. To get-to get away. That's all I wanted." Heather testified that she was "not a runner" because she had "broken [her] leg area" at some time in the past.
At trial, the following colloquy transpired between Heather and Defendant's attorney:
Q. Are you aware of what [sic] he was going to shoot at you, or anyone else for that matter, do you recognize at this point that [Defendant] was sort of the target of this guy?
A. Yes.
Q. What did you do next?
A. I got in the golf cart and we left.
Defendant still had the keys to the golf cart, so he got behind the wheel and Heather got in the passenger seat. The parking lot was packed with vehicles and people, which prevented Defendant from driving around the back of Bones toward the path they had taken from the house earlier that evening. Heather was not really thinking about what direction they should drive because she was still focused on the "altercation" that had just taken place; however, she saw that the way to the back path was blocked and therefore "was not the fastest out." Defendant "pulled out of the parking lot the only way we could in the golf cart." When asked on cross-examination whether she believed it was safer for them to drive the golf cart through the parking lot and onto the road instead of running away, Heather stated: "The golf cart can go *701 faster than I can go. It was a split-second decision and it seemed the only option." Heather was asked the following, and then answered:
Q. ... Do you have any doubt that had you not taken the actions that [Defendant] and you took that evening in getting into that golf cart and fleeing through the open area of the parking lot, that you might have been hurt or killed by that person who pulled the gun?
A. I have no doubt.
*338 Heather testified that she did not notice Deputy Legan until after they had turned off the road and onto the dirt path to head home. She stated: "We went along the road along the clump of trees and then on to the dirt path and that's where we were pulled over." Where they had turned onto the dirt path was a short distance from Bones' parking lot, and Heather first saw Deputy Legan "within minutes" of the altercation in the parking lot. Although she did not know, Heather assumed they had been pulled over initially because of the altercation in the Bones' parking lot.
Deputy Legan testified that he passed Defendant driving the golf cart on Old U.S. 1, turned around in the Bones parking lot, which was crowded, then pulled up behind Defendant after Defendant had turned the golf cart off the highway and onto a dirt path that connected Old U.S. 1 to Friendship Road. Deputy Legan testified that the distance from Bones parking lot to where Defendant stopped "was no more than point two-tenths of a mile[,]" and that Defendant was stopped "maybe fifty to a hundred feet" down the dirt path connecting Old U.S. 1 highway to Friendship Road. A map of the relevant area, introduced for illustrative purposes, shows that the distance from the north end of the parking lot to the dirt path was just over 500 feet, or approximately one-tenth of a mile, and the spot marked on the map as the place Deputy Legan first contacted Defendant was approximately fifty feet down the dirt path.
Heather testified that after being pulled over:
It was all happening so fast. It was just very chaotic. I was telling the deputy what I was thinking. I told him everything that just happened.
Q. When you say "everything" what does that mean?
A. The fight, the gun, the chaos.[7]
Q. Did you think that there was any other reasonable solution to what you and [Defendant] did in fleeing?
A. No, I don't.
Q. Had you been able to get back through that grass,-was that your intention, to drive through the night, you know, either have you drive or [Defendant] drive on a grass path?
*339 A. The way we came, yes.
Q. You have cars, actual cars?
A. Vehicles, yes.
Q. Why did you choose to drive basically a glorified golf cart on that evening?
A. Because it was not far. It's, you know, a close drive and if we're going to be drinking it's probably the smarter thing to do.
Heather testified that she did not talk much to the deputies because she "was crying and was upset[.]" Heather did not know if Defendant discussed the gun with the deputies, but she clearly heard Defendant tell them about the fight. Deputy Legan testified Defendant stated he had been in an altercation and that Deputy Legan would probably be receiving a call about it. Deputy Legan testified that Defendant had referred to the man as "the baddest motherf_cker in the bar[,]" and "seemed a bit agitated" at the time. Defendant exercised his right not to testify at his trial.
C. Elements of Necessity
1. Reasonable Action Taken to Protect Life, Limb, or Health
We address the first two elements of the defense of necessity-(1) reasonable action *702 (2) taken to protect life, limb, or health of a person-together. Defendant did not testify at trial; therefore, all evidence relating to the reasonableness of the actions he took, and the legitimacy of his concerns that people's lives were in jeopardy, was introduced through the testimony of Heather and Deputy Legan. When viewed in the light most favorable to Defendant, this testimony indicated the following: Bones attracted a potentially rough clientele, including, according to Deputy Legan, "the biker crowd." It was not unusual for fights to break out between patrons, but Bones employed no obvious security. While Defendant was at Bones for close to three hours on the evening of 1 March 2014 and into the early morning of 2 March 2014, the atmosphere in Bones became increasingly "intense" and "mean" to a degree that Heather testified she wanted to leave, and Defendant agreed that they should do so. Defendant got into an argument with between three and five men in the Bones' parking lot which escalated from arguing to shouting and cursing. The main individual with whom Defendant was arguing, "the man," was in his late twenties to early thirties, and Defendant described him as "the baddest motherf_cker in the bar[.]" This altercation escalated to the point that Defendant punched the man, *340 knocking him to the ground. The man got back up, "extremely red-faced," drew a handgun from his waistband, and threatened Defendant. Neither Defendant nor Heather were armed.
In response to the man's threatening actions with the gun, the scene turned "chaotic." A woman nearby told Heather-and likely Defendant as well-that the man was "crazy" and they needed to "get out of [t]here."[8] Heather started screaming, and just wanted to get away from what was clearly a dangerous and volatile situation. Heather testified to the obvious concern that the man might shoot Defendant, her, or someone else with his gun, and further testified that Defendant would have been the most obvious potential target. When Defendant became aware of the gun, and the obvious danger associated with a man he had just assaulted brandishing a firearm, he "screamed" at Heather "go, go, go, go, go." During her testimony, Heather stated that she had "no doubt" that had she and Defendant "not taken the actions that [they] took that evening in getting into [the] golf cart and fleeing through the open area of the parking lot, that [they] might have been hurt or killed by [the man] who pulled the gun[.]" Deputy Legan testified that Defendant "seemed agitated" when speaking with Deputy Legan immediately after the incident, and that Defendant described the man with the gun as "the baddest motherf_cker in the bar."
As our Supreme Court has stated:
Circumstantial evidence and direct evidence are subject to the same test for sufficiency, and the law does not distinguish between the weight given to direct and circumstantial evidence. ....
Circumstantial evidence is often made up of independent circumstances that point in the same direction. These independent circumstances are like
"strands in a rope, where no one of them may be sufficient in itself, but all together may be strong enough to prove the [element at issue]. ... [E]very individual circumstance must in itself at least tend to prove the [relevant element] before it can be admitted as evidence."
State v. Parker , 354 N.C. 268, 279, 553 S.E.2d 885, 894 (2001) (citations omitted). Further, "[t]his Court has held that it is fundamental to *341 a fair trial that a witness's credibility be determined by a jury," State v. Crabtree , --- N.C. App. ----, ----, 790 S.E.2d 709, 715 (2016) (citation omitted), and issues of common sense are for the jury to decide. State v. Zuniga , 320 N.C. 233, 251, 357 S.E.2d 898, 910 (1987). This Court cannot decide issues of credibility, must take all proper testimony favorable to Defendant as true, and resolve any conflict in the evidence in Defendant's favor. *703 When viewed in the light most favorable to Defendant, we hold that substantial evidence was presented that could have supported a jury determination that a man drawing a previously concealed handgun, immediately after having been knocked to the ground by Defendant, presented an immediate threat of death or serious bodily injury to Defendant, Heather, or a bystander, and that attempting to escape from that danger by driving the golf cart for a brief period on the highway was a reasonable action taken to protect life, limb, or health. Hudgins , 167 N.C. App. at 710-11, 606 S.E.2d at 447, see also Cooke , 94 N.C. App. at 387, 380 S.E.2d at 382-83 (evidence that the defendant "drove the vehicle away from a drunken party in the country because several irate people were chasing him on foot" "tend[ed] to show that defendant was justifiably in fear for his safety when he drove away from his pedestrian pursuers").
Further, even assuming arguendo that "fear" of some sort is an element of necessity, we hold that substantial evidence was presented at trial upon which the jury could have made a common sense determination that a reasonable person in Defendant's position would become frightened by the appearance of a gun in the hand of the man Defendant had just punched in the face. Based on the evidence presented at trial, the jury could have reasonably inferred that Defendant was afraid for his life, Heather's life, or the lives of others present in the parking lot, and that this fear was objectively reasonable. Because substantial evidence of these two elements was produced at trial, final determination of "[w]hether [Defendant's actions were] reasonable under the circumstances ... w[as a] question[ ] for the jury." Hudgins , 167 N.C. App. at 711, 606 S.E.2d at 448.
2. No Other Acceptable Choices
We now review the record to determine if substantial evidence was presented at trial from which the jury could have determined that there were "no other acceptable choices available" to Defendant at the time he chose to drive the golf cart while intoxicated. Id . at 711, 606 S.E.2d at 447 (citation omitted). This element is closely associated with the "reasonable action" element, and we include our analysis above in our analysis of this element.
*342 Initially, the State, in its argument, relies on evidence favorable to the State while discounting evidence favorable to Defendant, which is not permissible on appellate review. Brown , 182 N.C. App. at 117-18, 646 S.E.2d at 777. For example, the State argues that Defendant (and Heather) were capable of running and that the golf cart could not travel much more than five miles-per-hour. Based upon this evidence favorable to the State, the State argues that Defendant and Heather should have run away instead of having Defendant drive, or that, if Defendant was going to drive, he should have taken a route that did not involve the highway. However, Heather testified they would have driven the golf cart back the way they had come had that had been an option-and thereby would have avoided driving on the highway-but the route that would have allowed them to avoid driving on the highway was blocked by automobiles and people. Heather testified she did not believe there "was any other reasonable solution to what [she and Defendant] did in fleeing[.]" Heather also testified that Defendant "pulled out of the parking lot the only way we could in the golf cart." (Emphasis added).
In support of another argument, the State improperly quotes Deputy Legan's testimony that Heather did not appear to have been intoxicated. The State argues that even if it was reasonable to use the golf cart to get away, and even if the only available open route was onto the highway for at least a brief period, it should have been the more sober Heather, not Defendant, who did the driving. However, there was evidence presented strongly suggesting Heather would have been intoxicated at the relevant time, and it was for the jury, not the trial court, to weigh that evidence. Heather testified that while at Bones-a period of less than three hours-she consumed "more than four, less than seven" alcoholic drinks, and that she did not eat anything during that time because she had "eaten dinner before leaving the house that evening." The jury could use their common sense and lay knowledge to determine *704 that Heather was also likely intoxicated at the time of the incident. Defendant's evidence was that he had the keys to the golf cart; that he was a military veteran trained to make quick, reasoned decisions in a crisis; that Heather was panicking, as evidenced by her testimony that she was screaming and not really focusing on anything other than the desire to get away; that Defendant instigated their departure from the scene by yelling at Heather "go, go, go, go, go."
At the charge conference, the State argued the following in support of denying the necessity instruction:
Well, [Defendant's] witness[ ] has stated there was nothing else we could do. It's still in the [trial c]ourt's view to *343 analyze the circumstances and come to that same conclusion. In this case it's not been shown why it was not simply available to these individuals who their own witness testified we can both run. The bar was still-that they could have gone back into the bar or simply run and disperse into this crowd of people.
It was not the province of the trial court to analyze the evidence and come to a conclusion concerning whether driving away in the golf cart constituted a reasonable option for Defendant, or whether running into the crowd, or back into Bones, constituted viable alternatives to driving away in the golf cart. Those decisions, based on credibility analysis and weighing of the evidence, were the sole province of the jury. The only role of the trial court at that point was to determine whether sufficient evidence had been admitted upon which the jury could decide in favor of Defendant on those contested issues. Though the jury might have rejected some or all of the testimony favorable to Defendant, it was the province of the jury to make those determinations. Just like the trial court in this instance, this Court cannot make any determinations concerning the weight to be given Defendant's evidence, or the credibility of any witness. After reviewing the facts before us in the light most favorable to Defendant, we hold that Defendant met his burden of introducing "evidence that a reasonable person would find sufficient to support" the "no other acceptable choices" element. Hudgins , 167 N.C. App. at 709, 711, 606 S.E.2d at 446-47 (citations omitted).
3. Abatement of the Perceived Danger
We further hold there was substantial evidence from which the jury could determine that a reasonable person in Defendant's position could have maintained the concern that both Defendant's and Heather's lives were in jeopardy, and further maintained the concern that the danger had not clearly abated by the time Deputy Legan stopped the golf cart. In Cooke , supra , involving the defense of duress, the defendant presented evidence "that he drove the vehicle away from a drunken party in the country [while intoxicated] because several irate people were chasing him on foot[.]" Cooke, 94 N.C. App. at 387, 380 S.E.2d at 382. This Court held on those facts:
[Evidence was presented that the defendant] had been driving on different public highways for about thirty minutes when the officer stopped him. While this evidence tends to show that defendant was justifiably in fear for his safety when he drove away from his pedestrian *344 pursuers , it does not tend to show that he was still justifiably fearful thirty minutes later after his pursuers had been left many miles behind . [N]othing in the record suggests that defendant would have exposed himself to harm of any kind if he had stopped driving the car long before the officer saw him.
Id. at 387, 380 S.E.2d at 382-83 (emphasis added) (citations omitted); see also State v. Kapec , 234 N.C. App. 117, 761 S.E.2d 754, 2014 WL 2116530, *5 (2014) (unpublished) (Distinguishing Cooke , and holding evidence was sufficient to require an instruction on the defense of necessity: "[W]e do not agree with the State that the result in this case is controlled by State v. Cooke . In Cooke , the defendant was stopped by police after 'he had been driving on different public highways for about thirty minutes.' We held that although the 'evidence tends to show that defendant was justifiably in fear for his safety when he drove away from his pedestrian pursuers,' there was no evidence that 'he was still justifiably fearful thirty minutes later after his pursuers had been left many miles behind.'
*705 In this case, defendant was stopped by Officer Mobley about three blocks from Mr. Cayson's house and within five minutes of leaving. Cooke is factually distinguishable and does not control the outcome of the present case.").
In the present case, Deputy Legan testified that Defendant had pulled off the highway approximately two-tenths of a mile from Bones' parking lot, and Heather testified that she saw Deputy Legan "within minutes" after the altercation in the parking lot. On the facts of this case, including the fact that Defendant's evidence was that there was a man with a firearm who had threatened to shoot Defendant, and who would likely have access to a vehicle, we hold two-tenths of a mile was not, as a matter of law , an unreasonable distance to drive before pulling off the highway. That determination should have been made by the jury following a correct instruction on the defense of necessity.
4. Duress
Finally, were we to conduct our analysis applying the elements of duress, the result would not change. We hold that there was substantial evidence, when viewed in the light most favorable to Defendant, to have supported a jury determination that (1) Defendant's " 'actions [briefly driving the golf cart on the highway while intoxicated] were caused by [Defendant's] reasonable fear that [Defendant or another] would suffer [ (2) ] immediate death or serious bodily injury[,]' " (3) had Defendant did not taken those actions, and (4) Defendant had no "reasonable *345 opportunity to avoid doing the act without undue exposure to death or serious bodily harm." Smarr , 146 N.C. App. at 54-55, 551 S.E.2d at 888 (citations omitted).
5. Prejudice
Defendant must still demonstrate that the trial court's failure to give an instruction on necessity prejudiced him:
Even if a trial court errs by failing to give a requested and legally correct instruction, the defendant is not entitled to a new trial unless there is "a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial."
State v. Fletcher , 370 N.C. 313, 324, 807 S.E.2d 528, 537 (2017) (citations omitted). We hold, on the facts before us, that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C. Gen. Stat. § 15A-1443(a) (2017).
III. Conclusion
We vacate Defendant's conviction for DWI and remand for a new trial on that charge. Defendant's adjudication of responsible for driving left of the center line is not affected by our holding. If Defendant is re-tried on the DWI charge and he requests an instruction on the defense of necessity, the trial court shall issue a proper instruction on the defense of necessity if, when viewed in the light most favorable to Defendant, the evidence is such that the jury could reasonably find, to its satisfaction, that Defendant's actions constituted "(1) reasonable action, (2) taken to protect life, limb, or health of a person, and (3) no other acceptable choices [were] available." Hudgins , 167 N.C. App. at 710-11, 606 S.E.2d at 447 (citation omitted). If the trial court instructs the jury on necessity, the instruction shall be in accordance with the established elements of that defense. The same mandate also applies should the trial court instruct the jury on the defense of duress.
NEW TRIAL.
Judges CALABRIA concurs.
Judge DILLON concurs with separate opinion.

In the transcript the case is identified as "State v. Batson ;" however, it is clear that the case discussed was Badson .

See also State v. Smith , --- N.C. App. ----, 791 S.E.2d 544, 2016 WL 6081424, at *3 (2016) (unpublished opinion conflating duress and necessity).

We note that on appeal, both Defendant and the State limit their arguments to whether the trial court erred by failing to give an instruction on necessity , and do not discuss the defense of duress.

However, if the trial court in the present case correctly interpreted "fear" as it relates to duress, and the instruction for duress, then the defenses of necessity and duress have clearly not merged in North Carolina since necessity requires no proof of any state of mind.

We make no attempt to answer whether the showing required to prove "no other acceptable choices were available" to a defendant is the same as the showing required to prove a defendant had no "reasonable opportunity to avoid doing the [illegal] act without undue exposure to death or serious bodily harm." We also note that N.C.P.I. Crim. 310.10 includes no express requirement that the jury find an absence of reasonable alternatives: "The defendant would not be guilty of this crime if his actions were caused by a reasonable fear that he (or another) would suffer immediate death or serious bodily injury if he did not commit the crime." N.C.P.I. Crim. 310.10.

The woman was referring to the man with the gun.

On cross-examination, Heather appears to contradict this testimony that she had told a deputy about the fight and the gun, but because we are reviewing the evidence in the light most favorable to Defendant, we do not consider that testimony. Contradictions in the evidence and issues of credibility were for the jury to decide.

The jury was free to make the inference that Defendant, who was standing next to Heather, would have heard these comments too.