IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-501

No. COA20-564

Filed 21 September 2021

Iredell County, Nos. 17 CRS 57458, 18 CRS 661

STATE OF NORTH CAROLINA

v.

KEVIN LEE JOHNSON

Appeal by Defendant from Judgment entered 25 February 2020 by Judge Joseph N. Crosswhite in Iredell County Superior Court. Heard in the Court of Appeals 25 May 2021.

*Attorney General Joshua H. Stein, by Associate Attorneys General Jarrett McGowan and Robert Pickett, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Michele A. Goldman, for defendant-appellant.*

HAMPSON, Judge.

## **Factual and Procedural Background**

Kevin Lee Johnson (Defendant) appeals a Judgment entered upon his guilty pleas to Felony Possession of Cocaine and to having attained Habitual-Felon Status. The Record tends to reflect the following:

On the afternoon of 22 December 2017, Lieutenant Chris Stone (Lieutenant Stone) of the Iredell County Sheriff's Office was on duty and "sitting in the parking

lot of a convenience store" on Taylorsville Highway. Lieutenant Stone saw Defendant get in a vehicle in the convenience store parking lot. According to Lieutenant Stone, he did not see Defendant put on his seatbelt upon entering the vehicle. Lieutenant Stone observed Defendant as Defendant drove past Lieutenant Stone's patrol car and, according to Lieutenant Stone, Defendant had still not put on his seatbelt. Lieutenant Stone initiated a traffic stop of Defendant's vehicle moments after Defendant drove out of the convenience store parking lot. When Lieutenant Stone approached the driver's window of Defendant's vehicle, he noticed Defendant still did not have his seatbelt on. Lieutenant Stone informed Defendant he stopped him for a seatbelt infraction but that Lieutenant Stone "was not going to write him a citation. If that's all that was wrong, then [Lieutenant Stone] was going to give him a warning."

¶ 3    Almost immediately, Lieutenant Stone asked Defendant to get out of Defendant's vehicle and "come back to [Lieutenant Stone's] vehicle." As Defendant walked back towards Lieutenant Stone's vehicle, Lieutenant Stone asked Defendant if "[Defendant] had anything illegal in his possession." Defendant said "no." Lieutenant Stone then asked if he "could search [Defendant]." Video from Lieutenant Stone's patrol car shows Defendant stop, as he is still walking back towards Lieutenant Stone's patrol car, and raise his hands above his waist. Lieutenant Stone proceeded to reach into Defendant's sweatshirt pockets, then into Defendant's trouser

pockets. Eventually, Lieutenant Stone reached into Defendant's right trouser pocket and found "a plastic wrapper with some type of soft material inside, which [Lieutenant Stone] believed was possibly powder cocaine[.]" Video evidence reflects Lieutenant Stone never conducted an external pat down of Defendant's person before instructing Defendant to get in the front passenger seat of the patrol vehicle.

¶ 4        Lieutenant Stone placed Defendant in the front seat of his patrol vehicle and ran Defendant's license to make sure it was valid. Lieutenant Stone "advised [Defendant] that if he was interested in working with one of our narcotics detectives, he could possibly avoid being charged." Lieutenant Stone gave Defendant a "name and phone number to call." Lieutenant Stone did not charge Defendant for possession of cocaine that day; Lieutenant Stone allowed Defendant to return to his vehicle and leave. However, Lieutenant Stone "followed up with [his] supervisor . . . a short time later" and learned Defendant had not contacted the Sheriff's Office.

¶ 5        On 5 March 2018, an Iredell County Grand Jury indicted Defendant on charges of Felony Possession of Cocaine and Felony Possession of Drug Paraphernalia as well as having attained Habitual-Felon Status. On 6 March 2019, Defendant filed a Motion to Suppress "the cocaine found in his pocket." In his Motion, Defendant argued Lieutenant Stone did not have reasonable suspicion to stop Defendant for the seatbelt infraction and, even if the stop was lawful, Lieutenant Stone's "going through the Defendant's pockets for a violation of a seatbelt was excessive, unconstitutional,

and unlawful." Defendant argued he did not give Lieutenant Stone consent to search his pockets—Defendant supported the Motion with a signed affidavit stating Defendant consented "to be patted down for weapons" but not for a search of his pockets.

¶ 6        Defendant's Motion came on for hearing on 8 November 2019. During the hearing, Lieutenant Stone testified: "I asked him if he had anything illegal in his possession. That's what I always ask people. . . . I asked him if I could search him. I did not ask if I could pat him down. . . . I teach new deputies . . . [a]lways ask to search [people]." When asked why he always asks to search people during traffic stops, Lieutenant Stone replied: "For safety reasons, you know. If somebody has a weapon on them, then I definitely want to know that. . . . I want to know that before they sit in the front seat of my car."

¶ 7        Defendant also testified at the hearing. Defendant claimed that he had, in fact, been wearing his seatbelt when Lieutenant Stone pulled him over. Defendant also testified Lieutenant Stone asked if he could "pat [Defendant] down for weapons[.]" Defense counsel argued the evidence did not support a finding Lieutenant Stone had reasonable suspicion to stop Defendant for not wearing a seatbelt. Defense counsel also argued, in the alternative, that Defendant did not give knowing consent for Lieutenant Stone to search Defendant's pockets. Thus, according to Defendant, although Lieutenant Stone could have frisked Defendant as

part of the traffic stop with Defendant's consent, because Lieutenant Stone lacked reasonable suspicion of criminal activity beyond the seatbelt infraction, Defendant's consent could not knowingly extend past a frisk allowed for officer safety.

¶ 8    The trial court made the following oral Findings and Conclusions:

> The officer stopped the defendant, told him he stopped him for a seatbelt violation, but was just giving him a warning. The court finds at that point, that the officer had reasonable suspicion to stop the vehicle because of his observations about the seatbelt. At that point, after asking -- after telling the defendant that he was just giving him a warning, the officer asked the defendant if there was anything illegal on his person. The defendant responded there was not. The officer asked, "can I search you?" The defendant gave consent to search. The officer conducted a search and found a package that he believed to be powder cocaine. The court finds that the officer asked for the defendant's consent to search, and the defendant gave consent to search. However, the defendant indicates that the officer asked if he could pat him down. The court finds that if that were the situation, then when the officer did pat him down and felt an object in his pocket that was -- that was a knotted bag, that that would come under the plain [feel] exception, and he would have had -- the officer would have had probable cause to be able to retrieve that item. And so, either way the court does find that the officer's actions were justified in this matter. So, therefore the motion to suppress is denied.

¶ 9    Subsequently, upon the denial of his Motion to Suppress, Defendant entered guilty pleas to Felony Possession of Cocaine and having attained Habitual-Felon-Status as evidenced by the Transcript of Plea. Defendant's Transcript of Plea expressly reserved Defendant's right to appeal the trial court's denial of his Motion

to Suppress.  Defendant gave oral Notice of Appeal at the plea hearing and filed written Notice of Appeal on 25 February 2020.

## **Issues**

The issues on appeal are whether: (I) Defendant has preserved his argument his consent was involuntary on the basis Lieutenant Stone strayed from the traffic stop's mission and measurably prolonged the stop; and, if so, (II) the trial court erred in denying Defendant's Motion to Suppress evidence of the cocaine found on Defendant because Defendant's consent for the search was involuntary as a matter of law.[1]

## **Analysis**

### I. Preservation

As a threshold matter, the State contends that because Defendant did not specifically argue before the trial court that the search was unrelated to the mission of the traffic stop and added undue delay to the stop, Defendant has not preserved

---

[1] On appeal, Defendant also argues: Lieutenant Stone exceeded the scope of the consent Defendant gave because Defendant only consented to an external frisk; the trial court erred by failing to make Findings regarding the voluntariness of Defendant's consent; and, even if the search did not violate the Fourth Amendment to the United States Constitution, it violated Art. I § 20 of the North Carolina Constitution.  However, because we conclude Lieutenant Stone's request for consent to search and subsequent search of Defendant's pockets constituted an unreasonable search and seizure, we do not reach these arguments.

this theory for appeal under Rule 10(a)(1) of our Rules of Appellate Procedure. Rule

10(a)(1) of the North Carolina Rules of Appellate Procedure requires:

> In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired . . . if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's . . . motion.

N.C.R. App. P. 10(a)(1) (2021). "The theory upon which the case is tried in the lower

court must control in construing the record and determining the validity of the

exceptions. Further, a constitutional question which is not raised and passed upon

in the trial court will not ordinarily be considered on appeal[.]" *State v. Benson*, 323

N.C. 318, 322, 372 S.E.2d 517, 519 (1988) (citation omitted). Moreover, "a defendant

may not assert on appeal a new theory for suppression which was not asserted at

trial." *State v. Smarr*, 146 N.C. App. 44, 56, 551 S.E.2d 881, 88 (2001) (concluding

the defendant's "fruit of the poisonous tree" argument on appeal, based on a lack of

Miranda warnings, should not be considered where the defendant argued his

admission was inadmissible because it was not knowing and voluntary or that the

testimony regarding the admission was not the best evidence at trial).

¶ 12        Where a defendant does not argue a constitutional theory at trial and later

argues a constitutional theory on appeal, or a defendant argues one constitutional

theory at trial and a different constitutional theory on appeal, the defendant may be

deemed to have failed to preserve their appellate arguments under Rule 10(a)(1). *See Benson*, 323 N.C. at 322, 372 S.E.2d at 519; *State v. Bursell*, 372 N.C. 196, 200, 827 S.E.2d 302, 305 (2019) ("The transcript from the sentencing hearing reveals that defendant did not clearly raise the constitutional issue of whether the lifetime SBM imposed on him constituted a reasonable search under the Fourth Amendment. Though defense counsel specifically objected to imposition of lifetime SBM, this objection questioned the sufficiency of the evidence supporting the SBM order."); *State v. McPhail*, 329 N.C. 636, 640-41, 406 S.E.2d 591, 595 (1991) ("[T]he defendant objected on the ground that allowing his own expert to testify for the State would violate his due process rights under the fourteenth amendment. The trial court overruled that objection. On appeal, the defendant now contends for the first time that allowing his expert to be called and to testify as a witness for the State violated his sixth amendment right to effective assistance of counsel. Having failed to challenge the admission of the evidence in question on this ground during the trial, the defendant will not be allowed to do so for the first time on his appeal to this Court.").

¶ 13        In this case, Defendant argued in his Motion to Suppress:

> 10. The officer did not have the ability to clearly see whether or not the Defendant was wearing his seatbelt. Defendant maintains that he was wearing his seatbelt. The stop of the vehicle was without reasonable suspicion and was therefore unconstitutional.

11. Even if the Court determines that the stopping of the Defendant's vehicle was lawful, the search of going through the Defendant's pockets for a violation of a seatbelt was excessive, unconstitutional, and unlawful. . . .

. . . .

13. That the defendant's person was unlawfully searched and property was seized by Officer Stone in violation of the Fourth Amendment to the United States Constitution and in violation of the North Carolina Constitution and that the recovery of items from the defendant's person by an officer acting without a search warrant was as a result of an unconstitutional search and seizure.

¶ 14        Here, unlike in the cases cited above, Defendant did not argue the evidence was inadmissible based on one constitutional provision at trial and another provision on appeal. Defendant argued Lieutenant Stone did not have reasonable suspicion for the stop generally and that Defendant's "person was unlawfully searched and property was seized by Officer Stone in violation of the Fourth Amendment[.]" Thus, Defendant argued Lieutenant Stone's search violated Defendant's right to be free from unreasonable search and seizure as protected by the Fourth Amendment. On appeal, Defendant continues to argue Lieutenant Stone's search violated Defendant's rights as protected by the Fourth Amendment, albeit on slightly different factual bases than Defendant argued to the trial court. Although Defendant now argues Lieutenant Stone strayed from the traffic stop's mission and added measurable delay to the stop, thus rendering the search unlawful, Defendant has not changed his

underlying constitutional basis for suppression. *See Smarr*, 146 N.C. App. at 56, 551 S.E.2d at 88. Consequently, Defendant preserved this issue for appeal.

Moreover, even if Defendant did not preserve this issue for appeal under Rule 10(a)(1), Rule 2 of our Rules of Appellate Procedure affords this Court the discretion to waive Rule 10(a)(1)'s requirements to reach the merits of Defendant's arguments. Rule 2 provides:

> To prevent manifest injustice to a party, or to expedite decision in the public interest, either court of the appellate division may, except as otherwise expressly provided by these rules, suspend or vary the requirements or provisions of any of these rules . . . upon application of a party or upon its own initiative[.]

N.C.R. App. P. 2 (2021). In fact, recognizing he may have not preserved this issue on appeal, Defendant asks this Court, in the alternative, to exercise its discretion under Rule 2 to reach the merits of his argument.

" 'Rule 2 must be applied cautiously,' and it may only be invoked 'in exceptional circumstances.' " *Bursell*, 372 N.C. at 200, 827 S.E.2d at 305 (quoting *State v. Hart*, 361 N.C. 309, 315, 644 S.E.2d 201, 205 (2007)). "A court should consider whether invoking Rule 2 is appropriate 'in light of the specific circumstances of individual cases and parties, such as whether 'substantial rights of an appellant are affected.' " *Id.* (quoting *State v. Campbell*, 369 N.C. 599, 603, 799 S.E.2d 600, 602 (2017) (citation and quotation marks omitted)). "As a result, a decision to invoke Rule 2 and suspend

the appellate rules is always a discretionary determination." *Id.* at 201, 827 S.E.2d at 306 (citation and quotation marks omitted).

¶ 17        In this case, if Defendant failed to satisfy Rule 10(a)(1) to preserve his Fourth Amendment argument based on the facts argued on appeal, Defendant did raise directly related issues in his Motion to Suppress, which are necessarily intertwined with any analysis of the traffic stop under the Fourth Amendment. Unlike in other cases—including cases where this Court has chosen to exercise its discretion under Rule 2 and reach the merits of appellants' unpreserved arguments—here, Defendant's Motion did argue similar constitutional theories in the trial court. *See State v. Hall*, 134 N.C. App. 417, 424, 517 S.E.2d 907, 912 (1999) (reviewing the defendant's in-court identification argument based on a theory not raised in the trial court); *see also State v. Adams*, 250 N.C. App. 664, 674, 794 S.E.2d 357, 364 (2016) (exercising discretion under Rule 2 to review the trial court's denial of the defendant's motion to suppress when the defendant did not object to the evidence at trial).

¶ 18        Moreover*,* our courts have "tended to invoke Rule 2 for the prevention of 'manifest injustice' in circumstances in which substantial rights of an appellant are affected." *Hart*, 361 N.C. at 316, 644 S.E.2d at 205 (citation omitted). But, where "the result would be no different if we chose to invoke Rule 2 to suspend the rules[,]" there is likely no manifest injustice. *State v. Patterson*, 185 N.C. App. 67, 73, 648 S.E.2d 250, 254 (2007) (declining to exercise Rule 2 discretion where the defendant's

argument had no merit and reviewing the argument would not change the outcome of the case). Here, however, Defendant raises a meritorious argument on appeal—thus, declining to exercise our discretion to review Defendant's argument would constitute manifest injustice where the State could not prove its case against Defendant without the challenged evidence. *See State v. Mullinax*, 180 N.C. App. 439, 443, 637 S.E.2d 294, 297 (2006) (reviewing defendant's assignment of error under Rule 2, in part, "[b]ecause of the potential impact on defendant's sentence from an incorrect prior record level calculation"). Therefore, assuming Defendant has failed to preserve his argument under N.C.R. App. P. 10(a)(1), we exercise our Rule 2 discretion to address the merits of Defendant's argument.

## II. Consent

Defendant argues, even if he consented to Lieutenant Stone's request for a full search, that consent was involuntary because the request and search was outside the traffic stop's scope, added time to the stop, and was not supported by reasonable suspicion of any criminal activity beyond the seatbelt infraction.

"When reviewing a ruling on a motion to suppress, we analyze whether the trial court's 'underlying findings of fact are supported by competent evidence . . . and whether those factual findings in turn support the [trial court's] ultimate conclusions of law.' " *State v. Bullock*, 370 N.C. 256, 258, 805 S.E.2d 671, 674 (2017) (quoting

*State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)) (alterations in original).

Here, the trial court found and concluded:

> The officer stopped the defendant, told him he stopped him for a
> seatbelt violation, but was just giving him a warning. The court
> finds at that point, that the officer had reasonable suspicion to
> stop the vehicle because of his observations about the seatbelt. At
> that point, after asking -- after telling the defendant that he was
> just giving him a warning, the officer asked the defendant if there
> was anything illegal on his person. The defendant responded
> there was not. The officer asked, "can I search you?" The
> defendant gave consent to search. The officer conducted a search
> and found a package that he believed to be powder cocaine. The
> court finds that the officer asked for the defendant's consent to
> search, and the defendant gave consent to search. However, the
> defendant indicates that the officer asked if he could pat him
> down. The court finds that if that were the situation, then when
> the officer did pat him down and felt an object in his pocket that
> was -- that was a knotted bag, that that would come under the
> plain [feel] exception, and he would have had -- the officer would
> have had probable cause to be able to retrieve that item. And so,
> either way the court does find that the officer's actions were
> justified in this matter. So, therefore the motion to suppress is
> denied.

¶ 21  Even if Defendant had consented to a full search in this context[2], such a

Finding would not have supported the legal conclusion Defendant's consent was

voluntary as a matter of law. "The Fourth Amendment to the United States

Constitution states that '[t]he right of the people to be secure . . . , against

---

[2] The trial court's findings do not resolve the dispute over the scope of Defendant's consent to be searched—that is, whether Defendant was consenting to be frisked for weapons or consenting to the full search of the interior of his pockets for contraband.

unreasonable searches and seizures, shall not be violated.' " *Bullock*, 370 N.C. at 257, 805 S.E.2d at 673 (citing U.S. Const. amend. IV) (alterations in original). " 'A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.' " *State v. Williams*, 366 N.C. 110, 116, 726 S.E.2d 161, 166 (2012) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407, 160 L. Ed. 2d 842, 846 (2005)). "[T]o detain a driver beyond the scope of the traffic stop, the officer must have the driver's consent or reasonable articulable suspicion that illegal activity is afoot. *Id.* (holding consent to search *after* the mission of the traffic stop was complete was voluntary) (citing *Florida v. Royer*, 460 U.S. 491, 497-98, 75 L. Ed. 2d 229, 236 (1983)). However, where "consent to search . . . was the product of an unconstitutional seizure," it is involuntary. *State v. Cottrell*, 234 N.C. App. 736, 752, 760 S.E.2d 274, 285 (2014). Moreover, "[i]f the officer's request for consent to search is unrelated to the initial purpose for the stop, then the request must be supported by reasonable articulable suspicion of additional criminal activity." *State v. Parker*, 183 N.C. App. 1, 9, 644 S.E.2d 235, 241-42 (2007) (citation omitted).

¶ 22      " 'Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop.' " *Bullock*, 370 N.C. at 257, 805 S.E.2d at 673 (quoting *Rodriguez v. United States*, 575 U.S. 348, 355, 191 L. Ed. 2d 492, 499 (2015) (citation and quotation marks omitted))(alterations in original).

"These inquiries include checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citation and quotation marks omitted). "In addition, 'an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely[,]' " including conducting criminal history checks. *Id.* at 258, 805 S.E.2d at 673-74 (citations omitted). Officer safety "stems from the mission of the traffic stop[;]" thus, "time devoted to officer safety is time that is reasonably required to complete that mission." *Id.* at 262, 805 S.E.2d at 676. "On-scene investigation into other crimes, however, detours from that mission." *Rodriguez*, 575 U.S. at 356, 191 L. Ed. 2d at 500. Moreover, "traffic stops remain[ ] lawful only so long as [unrelated] inquiries do not *measurably* extend the duration of the stop." *Bullock*, 370 N.C. at 262, 805 S.E.2d at 676 (alterations and emphasis in original) (citation and quotation marks omitted) (holding an officer's frisk of the defendant, for safety reasons, lasting eight or nine seconds did not measurably extend the stop).

¶ 23 Here, Lieutenant Stone did not articulate any reasonable suspicion of other criminal activity to support his asking for Defendant's consent to search. In fact, Lieutenant Stone stated he routinely asked for consent to a full search during traffic stops and taught other law enforcement officers to do the same. Thus, the pertinent inquiry is whether Lieutenant Stone's asking Defendant for consent to search and the subsequent search measurably extended the stop's duration rendering any

consent Defendant gave involuntary as a matter of law. This inquiry, in turn, depends on whether the search deviated from the traffic stop's mission. Certainly, a full search of Defendant's person for any illegal contraband was not related to the traffic stop based on a seatbelt infraction. However, officer safety is a part of every traffic stop's mission. *Bullock*, 370 N.C. at 262, 805 S.E.2d at 676.

An officer is permitted to detain and individual when the officer has a reasonable suspicion criminal activity is afoot and may conduct an external frisk of the detained person if the officer has reason to believe the detainee is armed and potentially dangerous. *See State v. Duncan*, 272 N.C. App. 341, 347, 846 S.E.2d 315, 320-21 (2020) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 372-73 124 L. Ed. 2d 334, 343-44 (1993)). Thus, it may have been reasonable for Lieutenant Stone to conduct an external frisk of Defendant for officer safety as a part of the traffic stop's mission. Moreover, this traffic stop's mission could have included a check for outstanding warrants and of Defendant's license and registration. However, the length and scope of a full search, before any of those permissible checks were completed, measurably— and impermissibly—extended the traffic stop in this case.

Here, the video evidence shows approximately twenty-six seconds elapsed from the time Defendant appears to raise his arms and complies with the search and when Lieutenant Stone finished reaching into all Defendant's pockets. Moreover, the video reflects Lieutenant Stone never conducted an external frisk and possibly missed

locations where Defendant could have concealed weapons instead focusing on the content of Defendant's pockets. Lieutenant Stone not conducting such a frisk belies his stated concern for his safety. Thus, although "a frisk that lasts just a few seconds[,]" and is conducted to enhance officer safety may not measurably extend a traffic stop, *Bullock*, 370 N.C. at 262-63, 805 S.E.2d at 677, the full search in this case lasting almost thirty seconds, and arguably not related to officer safety, did measurably extend the stop in this case. *See Duncan*, 272 N.C. App. at 353-54, 846 S.E.2d at 325 (a thirty-four-second "search into Defendant's jacket pockets had nothing to do with the 'mission' of the traffic stop" and measurably prolonged the stop).

¶ 26        Indeed, the State makes no argument that—absent Defendant's alleged consent—the search in this case would have been permissible under the Fourth Amendment. Rather, the State contends Lieutenant Stone's act of *requesting* consent to search did not measurably extend the traffic stop. However, as stated above, "[w]ithout additional reasonable articulable suspicion of additional criminal activity, the officer's request for consent exceeds the scope of the traffic stop and the prolonged detention violates the Fourth Amendment." *Parker*, 183 N.C. App. at 9, 644 S.E.2d at 242 (citation omitted).

¶ 27        Nevertheless, the State argues our decision in *State v. Jacobs* supports the State's position law enforcement officers need no additional, reasonable suspicion to

request consent to search defendants during a valid traffic stop.[3]  162 N.C. App. 251, 590 S.E.2d 437 (2004).  In *Jacobs*, the defendant pled guilty to drug charges after the trial court denied the defendant's motion to suppress evidence of drug possession law enforcement found after stopping the defendant's car and asking defendant for consent to search the car.  *Id.* at 252, 590 S.E.2d 439.  An officer with the Burlington Police Department stopped the defendant's car at approximately 1:43 a.m. because the officer saw the defendant's car "continuously weaving back and forth in its lane[.]"  *Id.*  Beyond the defendant's "weaving," the defendant's car also had a Tennessee license plate; the officer had recently been alerted that a murder suspect from Tennessee was in Burlington.  *Id.*

After the officer stopped the defendant's car, the officer "ordered [the] defendant out of the car and conducted a pat-down search to ensure [the] defendant was not armed."  *Id.*  The defendant's car was registered to a man with a different last name than the defendant, and the defendant stated the car was the defendant's brother's car, although he could not explain why the two had different last names.  *Id.* at 252-53, 590 S.E.2d at 439.  According to the officer, the defendant "appeared to be nervous[.]"  *Id.* at 253, 590 S.E.2d at 439.  The officer then told the defendant the

---

[3] The State makes this argument in opposing Defendant's argument the request for consent violated Art. I § 20 of the North Carolina Constitution.  We address whether *State v. Jacobs* supports the State's position on Fourth Amendment grounds and do not address whether the request for consent in this case violated the North Carolina Constitution.

officer "had information regarding the transport of drugs" between Tennessee and Burlington. *Id.* The officer asked the defendant if the defendant had any drugs in his car; the defendant replied he did not. *Id.* The officer asked the defendant for consent to search the car, and the defendant consented and told the officer there was a large amount of cash in the car "from the sale of a motorcycle." *Id.* As the officer searched the car, he smelled marijuana; the defendant admitted someone had smoked marijuana in the vehicle earlier. *Id.* at 253, 590 S.E.2d at 440. The officer found "a bundle of bills in a rubber band" and loose tobacco the officer believed came from hollowed-out cigars used to smoke marijuana. *Id.* The officer searched the defendant's person, including the defendant's "crotch," where the officer found plastic bags containing what the officer believed were methylenedioxymethamphetamine (MDMA) and marijuana. *Id.* at 253-54, 590 S.E.2d at 440.

¶ 29 On appeal, the defendant argued the trial court erred in denying his motion to suppress where, according to the defendant, the officer did not have reasonable suspicion for the stop, and the search of his car was unlawful, despite his consent, because "the length of the investigatory detention was unreasonable." *Id.* at 254-56, 590 S.E.2d 440-41. First, we held the trial court did not err in concluding the officer had reasonable suspicion to stop the defendant because the officer observed the defendant "weaving" in his lane giving rise to reasonable suspicion of impaired driving. *Id.* at 255-56, 590 S.E.2d at 440-41. Further, we held the officer had reason

to detain the defendant and ask him questions in order to dispel or confirm his suspicions about the Tennessee murder suspect and that the defendant's inability to answer the officer's questions and the defendant's nervousness gave rise to additional suspicion. *Id.* at 256-57, 590 S.E.2d at 441-42.

¶ 30 In the alternative, the defendant argued the State "failed to establish that [the officer] had sufficient reasonable suspicion to request defendant's consent for the search." *Id.* at 258, 590 S.E.2d at 442. We concluded "[n]o such showing is required." *Id.* We reasoned: "[w]hen a defendant's detention is lawful, the State need only show 'that defendant's consent to the search was freely given, and was not the product of coercion' . . . ." *Id.* (quoting *State v. Sanchez*, 147 N.C. App. 619, 626, 556 S.E.2d 602, 608 (2001) *disc. rev. denied*, 355 N.C. 220, 560 S.E.2d 358 (2002) (citation omitted)). Thus, we held the search of the defendant's car was lawful "[s]ince the search of defendant's car was admittedly consensual *and* was not tainted by an unlawful detention." *Id.* at 258, 590 S.E.2d at 443 (emphasis added).

¶ 31 However, *Jacobs* is inapposite here. In *Jacobs*, we held the defendant was already lawfully detained on suspicion of impaired driving. Thus, the officer in *Jacobs* already had reasonable suspicion to support a search for intoxicants in the defendant's vehicle. Therefore, the request for consent to search did not constitute further, unlawful detention because the officer had reason to believe evidence of impairment could be present, and the defendant's nervousness and inability to

answer questions added to the officer's suspicions. Here, unlike the officer in *Jacobs*, Lieutenant Stone had no reasonable suspicion of criminal activity unrelated to the initial reason for the traffic stop. Without any additional reasonable suspicion of unrelated criminal activity, Lieutenant Stone's request for consent for a full search unreasonably delayed the stop and tainted the consent Defendant gave. *See id.*; *see also Parker*, 183 N.C. App. at 9, 644 S.E.2d at 242. Therefore, Lieutenant Stone had not lawfully detained Defendant such that the State only had to show Defendant's consent was freely given and not the product of coercion. *See Jacobs*, 162 N.C. App. at 258, 590 S.E.2d at 442.

¶ 32        The State further argues our decision in *Parker*—restating the general proposition that a request for consent unrelated to the reason for the initial stop must be supported by reasonable suspicion of additional, criminal activity—"does not survive" our Supreme Court's decision in *Bullock*. In *Parker*, however, we in fact held law enforcement's request for consent to search was supported by probable cause where, during a valid "weapons frisk" of the vehicle just prior to the request for consent to search the defendant's purse, law enforcement found other drugs and drug paraphernalia creating at least reasonable suspicion of further criminal activity unrelated to defendant's speeding that caused law enforcement to stop the defendant's vehicle in the first instance. *Parker*, 183 N.C. App. at 11-13, 644 S.E.2d at 243-44. In this case, based on Lieutenant Stone's own testimony, he had no

reasonable, articulable suspicion of any further criminal activity that would support his request for consent for a full search of Defendant's person.

¶ 33    Moreover, our decision in *Parker* was left undisturbed by *Bullock* as *Bullock* was focused on how a frisk was related to the mission of the traffic stop generally. *See generally Bullock*, 370 N.C. 256, 805 S.E.2d 671. Indeed, the *Bullock* Court acknowledged: "Safety precautions taken to facilitate investigations into crimes that are unrelated to the reasons for which a driver has been stopped, however, are not permitted if they extend the duration of the stop." *Id.* at 258, 805 S.E.2d at 674. Here, the request to search and the full search of Defendant in this case was not related to the mission of the stop and wholly unsupported by any reasonable, articulable suspicion of other criminal activity afoot beyond the seatbelt infraction for which Lieutenant Stone initially stopped Defendant. Thus, because Lieutenant Stone's request for consent and his subsequent search of Defendant measurably prolonged the traffic stop for reasons unrelated to the stop's mission without reasonable suspicion, any consent Defendant gave for this full search was involuntary as a matter of law. Therefore, the trial court erred in denying Defendant's Motion to Suppress the cocaine found as a result of this unreasonable search.[4] Consequently,

---

[4] Alternatively, the trial court found Lieutenant Stone's "actions were justified" under the "plain feel exception." The trial court's Finding/Conclusion the evidence in this case would have been admitted under the plain feel exception is not supported by the Record. The

we reverse the trial court's denial of Defendant's Motion to Suppress. Moreover, we vacate the Judgment entered against Defendant based on his guilty pleas—entered subject to this appeal—to the charges of Felony Possession of Cocaine and the concomitant charge of attaining Habitual-Felon Status. We remand this matter to the trial court for further proceedings, including a determination of whether there is evidence to support the charges against Defendant or if these matters should be dismissed.

## **Conclusion**

Accordingly, for the foregoing reasons, we reverse the trial court's denial of Defendant's Motion to Suppress, vacate the Judgment, and remand this matter for further proceedings.

VACATED AND REMANDED.

---

plain feel exception applies "to cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search." *Minnesota v. Dickerson*, 508 U.S. 366, 375; 124 L. Ed. 2d 334, 345 (1993). However, as explained above, the search in this case was not a lawful search. Moreover, even if the trial court assumed Lieutenant Stone would have immediately recognized the contraband during an external frisk, nothing in the Record supports such an assumption. Lieutenant Stone did not know there was anything in Defendant's pockets until he reached inside them. As such, the plain feel exception does not apply in this case. *See State v. Beveridge*, 112 N.C. App. 688, 696, 436 S.E.2d 912, 916 (1993), *aff'd per curiam*, 336 N.C. 601, 444 S.E.2d 223 (1994) (declining to apply the plain feel exception where the officer conducted an external frisk and then exceeded the scope of that permissible frisk by asking the defendant to empty the contents of his pockets and where the officer's testimony did not establish the object was immediately recognizable as contraband during the frisk).

Judge CARPENTER concurs in a separate opinion.

Judge GRIFFIN concurs in a separate opinion.

CARPENTER, Judge, concurring.

I concur with the reasoning and the outcome that the application of the Constitutional protections to this case requires. I join the narrow analysis of the dispositive constitutional issue in this case set forth by Judge Griffin in his concurrence. I write separately to highlight that the legality of the stop of Appellant's vehicle was not challenged on appeal and there is no indication in the record in this case that racially disparate treatment was at issue.

Choosing to inject arguments of disparate treatment due to race into matters before the Court where such treatment is not at issue and does not further the goal of the equal application of the law to everyone. Rather, such a discussion functions to overshadow the other important constitutional issues of this case, and is not helpful to maintaining public confidence in the judiciary or the practice of law generally.

GRIFFIN, Judge, concurring.

I concur with the reasoning in the majority opinion. I write separately to indicate exactly where Lieutenant Stone violated the Fourth Amendment to the U.S. Constitution. The Defendant's brief also raises a question of impartiality in traffic stops, and our justice system generally, based on the color of a person's skin and their gender. This appeal to an emotion, and to nothing before us in the Record, must be addressed, as the law applies equally to everyone. This case presents a very specific set of facts to guide our analysis. The stop of Defendant's vehicle was supported by reasonable suspicion. "[R]easonable suspicion is the necessary standard for traffic stops[.]" *State v. Styles*, 362 N.C. 412, 415, 665 S.E.2d 438, 440 (2008) (citation omitted). Lieutenant Stone plainly articulated that he observed Defendant driving the vehicle without wearing a seatbelt. Defendant does not challenge on appeal the validity of the initial traffic stop.

Lieutenant Stone could and did lawfully ask Defendant to get out of the vehicle for safety reasons.

> [A] police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle. . . . Asking a stopped driver to step out of his or her car improves an officer's ability to observe the driver's movements and is justified by officer safety, which is a legitimate and weighty concern.

*State v. Bullock*, 370 N.C. 256, 261-62, 805 S.E.2d 671, 676 (2017) (citations and internal quotation marks omitted). A traffic stop is anything but routine and can

present any number of challenges to an officer and the individual stopped. An officer is authorized to take many investigatory and safety-related measures. Additionally, Lieutenant Stone could have checked for outstanding warrants, checked Defendant's driver's license, and inspected the vehicle registration. *Id.* at 257, 805 S.E.2d at 673. An officer can, and should, take officer safety into account during a traffic stop. *Id.* at 258, 805 S.E.2d at 674.

¶ 39     The issue in this case arises when Lieutenant Stone asks to search Defendant with no additional reasonable suspicion of other criminal activity. The only violation evident from the Record is the seatbelt violation. Here, Lieutenant Stone's testimony was clear that his intent was to search Defendant. The evidence in the Record supports this. The video of the interaction between Lieutenant Stone and Defendant cuts against an assertion that the search was for officer safety. Further, the trial court made no findings regarding officer safety concerns. The search was administered only in the pockets of Defendant. There was no pat down frisk. Lieutenant Stone reached directly into Defendant's pockets and did not search other areas of Defendant's person where weapons could be hidden. The evidence here does not indicate that the search was motivated by a concern for officer safety. Lieutenant Stone even stated that he asked to search "every single person that I stop" and that for years he had been training new deputies to "ask to search" people that they stop. An officer can certainly ask for consent to search an individual after a lawful

detention. However, under this specific set of facts, this search prolonged the mission of the stop in violation of the Fourth Amendment. *See Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (holding a traffic stop "remains lawful only so long as [unrelated] inquiries do not measurably extend the duration of the stop" (alteration in original) (citation and internal quotation marks omitted)). Lieutenant Stone articulated no additional reasonable suspicion of criminal activity for asking to search Defendant, thereby illegally delaying the stop. *See id.* (stating an officer "may not [conduct unrelated checks] in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual" (citation omitted)).

¶ 40        The analysis here does not limit or question the officer's ability to take safety precautions as articulated in *Bullock*. It also does nothing to limit a search pursuant to consent. If Lieutenant Stone had reasonable articulable suspicion of other criminal activity or had received valid consent for an additional search, the additional search would not have violated the Fourth Amendment by extending the encounter. *See State v. Reed*, 373 N.C. 498, 510, 838 S.E.2d 414, 423 (2020) (stating that "prolong[ing] a detention beyond the scope of a routine traffic stop requires . . . either the driver's consent or a reasonable suspicion that illegal activity is afoot" (citation and internal quotation marks omitted)).

¶ 41        Defendant's brief implies that U.S. citizens are treated differently under our laws based on the color of their skin. I reject this argument. The law is color blind

and applies equally to every citizen in the United States of America. This argument

in Defendant's brief is inflammatory and unnecessary.

¶ 42       It is hard to blame Defendant for raising this argument. The brief quoted

former North Carolina Chief Justice Beasley, who also implied in a speech on 2 June

2020 that our justice system does not treat people equally in the courtroom based on

the color of their skin:

> These protests highlight the disparities and injustice that
> continue to plague black communities. Disparities that
> exist as the result of policies and institutions; racism and
> prejudice have remained stubbornly fixed and resistant to
> change. These protests are a resounding, national chorus
> of voices whose lived experiences reinforce the notion that
> Black people are ostracized, cast out, and dehumanized.
> Communities are crying out for justice and demanding
> real, meaningful change.
>  . . .
> As the mother of twin sons who are young black men, I
> know that the calls for change absolutely must be heeded.
> And while we rely on our political leaders to institute those
> necessary changes, we must also acknowledge the distinct
> role that our courts play. As Chief Justice, it is my
> responsibility to take ownership of the way our courts
> administer justice, and acknowledge that we must do
> better, we must be better.
>
> When Chief Justice Martin convened a commission to
> study the justice system in 2015, that commission found
> that a majority of North Carolinians lack trust and
> confidence in our court system. Too many people believe
> that there are two kinds of justice. They believe it because
> that is their lived experience -- they have seen and felt the
> difference in their own lives.

> The data also overwhelmingly bears out the truth of those lived experiences. In our courts, African-Americans are more harshly treated, more severely punished and more likely to be presumed guilty. There are many ways to create change in the world, but one thing is apparent: the young people who are protesting everyday have made clear that they do not intend to live in a world in which they are denied justice and equality like the generations before them.
>
> We must develop a plan for accountability in our courts. Judges work hard and are committed to serving the public. But even the best judges must be trained to recognize our own biases. We have to be experts not just in the law, but in equity, equity that recognizes the difficult truths about our shared past. We must openly acknowledge the disparities that exist and are too often perpetuated by our justice system.
>  . . .
> Our pilot projects in eight North Carolina counties are already showing promising results that can be implemented statewide to truly bring change to a system that all too frequently punishes people disparately.

Cheri Beasley, *Chief Justice Beasley Addresses the Intersection of Justice and Protests around the State*, North Carolina Judicial Branch (June 2, 2020), https://www.nccourts.gov/news/tag/press-release/chief-justice-beasley-addresses-the-intersection-of-justice-and-protests-around-the-state.

¶ 43 This statement from the former Chief Justice has motivated Defendant in this case to assert that "[o]ur Constitution gives this Court the legal authority to carry out our Chief Justice's pledge." Defendant's statement highlights the problem with the judiciary becoming involved in public policy. The speech by the former Chief Justice

states our justice system does not treat people equally based on the color of their skin. It also encourages and charges the courts to become an active body by involving our judicial branch in policy decisions. The judiciary should at all times practice judicial restraint. Here, this Court reaches the correct legal outcome regardless of the color of Defendant.

¶ 44    We are fortunate to live in the United States of America where the law is applied the same to all citizens.